Rodolfo Ullonoa FLORES; Luisa Torres Cheequiezol, on behalf of Veronica Velazco Torres; Maxima Quispe Canargo, on behalf of William Angelo Caronado; Elena Casilla, on behalf of Henry Anderson Casilla; David Bacangel Aguilar Juana; Jaillita Manani; Able Valdivia Acevedo; and Mario Herrera, for the Estate of Mario Vitaliano Herrera Salinas, Plaintiffs,

v.

SOUTHERN PERU COPPER CORPORATION, Defendant.

No. 00 CIV. 9812(CSH).

United States District Court, S.D. New York.

July 16, 2002.

Taub & Showman, LLP, New York, NY, Schirrmeister Ajamie, Houston, TX, for Plaintff, Wallace A. Showman, Andrew C. Schirrmeister III, of counsel.

Covington & Burling, New York, NY, for Defendants, Eric Hellerman, Peter J. Nickles, of counsel.

### MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

The eight plaintiffs in this case, who are residents of Peru,[1] claim that they have suffered asthma and lung disease as a result of environmental pollution from defendant Southern Peru Copper Corporation's mining and refinery operations in and around Ilo, Peru. Southern Peru Copper Corporation ("Southern Peru" or "SPCC"), a Delaware corporation with its principal place of business in Peru, is owned in majority part by a company headquartered in Arizona, which in turn is wholly owned by a Mexican corporation. Plaintiffs contend that Southern Peru has violated international law and that this Court therefore has jurisdiction to adjudicate their claims under the Alien Tort

1. One plaintiff, Mario Vitaliano Herrera Salinas, is deceased. He resided in Peru prior to his death.

Claims Act, 28 U.S.C. § 1350 ("ATCA"),[2] and under the federal question jurisdiction statute, 28 U.S.C. § 1331. Defendant moves to dismiss the complaint under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim under international law and consequently a lack of federal jurisdiction; in the alternative, defendant moves to dismiss the action on the grounds of *forum non conveniens* and comity among nations.

## I. *The Alien Tort Claims Act and International Law*

### A. *General Principles*

The ATCA states: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The ATCA was originally enacted as part of the Judiciary Act of 1789 and was rarely invoked for nearly two hundred years. "As the result of increasing international concern with human rights issues, however, litigants have recently begun to seek redress more frequently under the ATCA." *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 104 (2d Cir.2000). The Second Circuit's decision in *Filartiga v. Pena–Irala*, 630 F.2d 876 (2d Cir.1980), marked the beginning of this recent in-crease in litigation brought under the ATCA. In that case, the court held that contemporary international law does not just govern the relations among states and the relations between a state and citizens of another state, but also governs certain acts, such as torture, committed by a state against its own citizens. *Id.* at 884–85. Then in *Kadic v. Karadzic,* 70 F.3d 232 (2d Cir.1995), the Second Circuit went a step further to hold that, under modern international law, "certain forms of conduct violate the law of nations whether undertaken by those acting under the auspices of a state or only as private individuals." *Id.* at 239.

■■■■ As is evident from the holdings of *Filartiga* and *Kadic,* "courts must interpret international law not as it was in 1789, but as it has evolved and exists among the nations of the world today." *Filartiga,* 630 F.2d at 881; *accord Kadic,* 70 F.3d at 238, 241. The ATCA provides for federal court jurisdiction where a plaintiff's claim involves a violation of a treaty of the United States or the "law of nations," which consists of rules that "command the 'general assent of civilized nations,'" *Filartiga,* 630 F.2d at 881.[3] The requirement that a rule achieve general assent before it becomes binding on all nations as international law is "stringent";

**2.** The statute is sometimes referred to in cases as the Alien Tort Act ("ATA") or the Alien Tort Statute ("ATS").

**3.** Section 102 of the Restatement (Third) of Foreign Relations Law describes the creation of rules of international law as follows:

(1) A rule of international law is one that has been accepted as such by the international community of states

(a) in the form of customary law;

(b) by international agreement; or

(c) by derivation from general principles common to the major legal systems of the world.

(2) Customary international law results from a general and consistent practice of states followed by them from a sense of legal obligation.

(3) International agreements create law for the states parties thereto and may lead to the creation of customary international law when such agreements are intended for adherence by states generally and are in fact widely accepted.

(4) General principles common to the major legal systems, even if not incorporated or reflected in customary law or international agreement, may be invoked as supplementary rules of international law where appropriate.

"[w]ere this not so, the courts of one nation might feel free to impose idiosyncratic legal rules upon others, in the name of applying international law." *Id.; see also Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 428–30, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (expressing reluctance to adjudicate issue of "a state's power to expropriate the property of aliens" under international law, given divergence of opinion between capitalist and communist nations). Thus, a plaintiff must demonstrate that a defendant's alleged conduct violated "well-established, universally recognized norms of international law" in order to establish federal subject matter jurisdiction under the ATCA. *Filartiga,* 630 F.2d at 888; *accord Kadic,* 70 F.3d at 239. Courts seek to determine whether a rule is well-established and universally recognized " 'by consulting the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognizing and enforcing that law.' " *Filartiga,* 630 F.2d at 880, *quoting United States v. Smith,* 18 U.S. (5 Wheat.) 153, 160–61, 5 L.Ed. 57 (1820); *accord Kadic,* 70 F.3d at 238.[4]

### B. *Plaintiffs' Claims Under International Law*

Plaintiffs claim that Southern Peru's acts of egregious environmental pollution violated their rights to life, health, and sustainable development, which plaintiffs contend are protected under international law. Plaintiffs rely on the affidavits of Professor Jordan Paust from the Law Center of the University of Houston and Professor Gunther Handl from Tulane University Law School, who cite numerous international documents as evidence of the rights asserted by plaintiffs under international law. Defendants dispute that any binding rule of international law applies to environmental pollution within a nation's borders. Furthermore, defendants argue that such a rule of international law, were it to exist, would apply only to the conduct of nations, not the conduct of private corporations such as Southern Peru. Defendants rely on the affidavits of Professor John Yoo from the University of California at Berkeley School of Law.[5]

Plaintiffs contend that no relevant caselaw in the United States bears on the viability of their particular claims under international law. It may be true that courts in this country have not previously considered the existence and scope under international law of the "right to life," "right to health," and "right to sustainable development," expressed in those particular terms, but courts in a handful of cases have considered claims similar to those raised in the present case. I turn first to those cases to see what guidance they may provide.

The case of *Aguinda v. Texaco, Inc.,* which was brought in this district, involves

---

**4.** Section 103 of the Restatement (Third) of Foreign Relations Law similarly identifies the various sources that may be consulted in ascertaining the scope of international law:

(1) Whether a rule has become international law is determined by evidence appropriate to the particular source from which that rule is alleged to derive (§ 102).

(2) In determining whether a rule has become international law, substantial weight is accorded to

(a) judgments and opinions of international judicial and arbitral tribunals;

(b) judgments and opinions of national judicial tribunals;

(c) the writings of scholars;

(d) pronouncements by states that undertake to state a rule of international law, when such pronouncements are not seriously challenged by other states.

**5.** After submitting his affidavits in this case, Professor Yoo joined the Office of the Legal Counsel in the United States Department of Justice.

claims under international law for personal injuries and environmental harms resulting from oil exploration conducted in Ecuador. The defendants made a motion to dismiss, which generated multiple opinions by the district court and one opinion by the Second Circuit; the case is currently pending on appeal again before the Second Circuit. No. 93 Civ. 7527 (VLB), 1994 WL 142006 (S.D.N.Y. Apr.11, 1994) (Broderick, J.); 945 F.Supp. 625 (S.D.N.Y.1996) (Rakoff, J.);[6] 175 F.R.D. 50 (S.D.N.Y.1997) (Rakoff, J.); *vacated sub nom. Jota v. Texaco, Inc.,* 157 F.3d 153 (2d Cir.1998); 142 F.Supp.2d 534 (S.D.N.Y.2001) (Rakoff, J.); *appeal argued,* 303 F.3d 470 (2d Cir. 2002).

In their motion to dismiss, the defendants in *Aguinda* challenged whether the plaintiffs had stated a claim under the ATCA and international law. Judge Broderick, in the first opinion of the district court, gave some initial consideration to the viability of the plaintiffs' claims under international law but then reserved decision on the issue and authorized limited discovery. 1994 WL 142006, at *6–7. Judge Broderick found the Rio Declaration on Environment and Development, U.N. Doc. A/CONF. 151/5/Rev. 1, 31 I.L.M. 874 (June 13, 1992) ("Rio Declaration"),[7] to be especially pertinent and opined that it was possible that "misuse of hazardous waste of sufficient magnitude" might violate international law. *Id.* at 7. On the other hand, he also stated that caution was necessary "in order to assure that decision making by other countries is not interfered with by adjudication in the United States under necessarily highly general con-

cepts." *Id.* Judge Broderick concluded that because the plaintiffs' claims involved "a massive industrial undertaking extending over a substantial period of time and with major consequences," and because the plaintiffs claimed that "steps in the United States were an integral part of the events at issue," discovery was warranted on the subject of the "events, if any, initiated or assisted in the United States which might violate international law." *Id.*

The case was reassigned to Judge Rakoff after Judge Broderick's death. After discovery, Judge Rakoff granted the motion to dismiss on the grounds of *forum non conveniens,* international comity, and failure to join indispensable parties, not reaching the question of whether the plaintiffs had stated a claim under international law. 945 F.Supp. at 627–28. On the question of *forum non conveniens,* Judge Rakoff largely adopted the findings and rationale of the court in *Sequihua v. Texaco, Inc.,* 847 F.Supp. 61 (S.D.Tex.1994), which dismissed on *forum non conveniens* grounds comparable claims asserted by residents of the same region in Ecuador against Texaco for contamination of the air, ground, and water in Ecuador. 945 F.Supp. at 627. The Second Circuit vacated the dismissal and remanded for reconsideration. 157 F.3d at 155. The court of appeals directed the district court to obtain Texaco's consent to jurisdiction in Ecuador and to reweigh independently the *forum non conveniens* factors rather than simply relying on *Sequihua. Id.* at 159. The court of appeals noted that *Sequihua* did not involve claims under the ATCA for

**6.** The caption of this opinion incorrectly spells the first plaintiff's name as "Aquinda."

**7.** The court quoted Principle 2, which proclaims: "States have, in accordance with the Charter of the United Nations and the principles of international law, the sovereign right to exploit their own resources pursuant to

their own environmental and developmental policies, and the responsibility to ensure that activities within their jurisdiction or control do not cause damage to the environment of other States or of areas beyond the limits of national jurisdiction."

violations of international law. *Id.* In a footnote, the court of appeals stated:

> We express no view on whether the plaintiffs have alleged conduct by Texaco that violates the law of nations, whether an ATA suit for environmental misconduct, alleged to violate the law of nations, may be brought against a nongovernmental entity under the ATA, or how the forum non conveniens balance for ATA claims is to be struck when alien plaintiffs select a United States forum for a suit against a domestic corporation.

*Id.* at 159 n. 6.[8] On remand, Judge Rakoff dismissed plaintiff's claims, relying only on the ground of *forum non conveniens.* 142 F.Supp.2d at 554. In weighing the public interest factors relevant to *forum non conveniens,* he commented: "[T]he specific claim plaintiffs purport to bring under the ATCA—that the Consortium's oil extraction activities violated evolving environmental norms of customary international law—lacks any meaningful precedential support and appears extremely unlikely to survive a motion to dismiss." *Id.* at 552 (citations omitted). Another appeal has been argued before the Second Circuit and is awaiting decision. No. 01–7756.

*Amlon Metals, Inc. v. FMC Corp.,* 775 F.Supp. 668 (S.D.N.Y.1991) (Conner, J.) involved a shipment of copper residue from New York to the United Kingdom.

The shipment having been condemned by British authorities, the plaintiff shipper sued the Maryland supplier, claiming *inter alia* that a cause of action lay under the ATCA because the extremely high toxicity of the shipment could "present imminent and substantial danger to human health and to the environment" and therefore was in violation of international law. *Id.* at 670. The court granted the defendant's motion to dismiss, finding that the plaintiff had failed to state a violation of international law and therefore that jurisdiction under the ATCA was lacking. *Id.* at 671. Plaintiffs in that case relied on the Stockholm Principles, United Nations Conference on the Human Environment (adopted June 16, 1972)[9] and the Restatement (Third) of Foreign Relations Law § 602(2) (1987).[10] The court found that the Stockholm Principles "do not set forth any specific proscriptions, but rather refer only in a general sense to the responsibility of nations to insure that activities within their jurisdiction do not cause damage to the environment beyond their borders." *Id.* at 671. As for the Restatement, the court said that it did not "constitute a statement of universally recognized principles of international law. At most, as plaintiffs' own brief suggests, the Restatement iterates the existing *U.S.* view of the law of nations regarding global environmental protection." *Id.*[11] The court's decision in *Amlon* was not appealed.

**8.** The Second Circuit did not instruct the district court to decide whether jurisdiction existed under the ATCA before considering the issue of *forum non conveniens.* The Fifth Circuit, on the other hand, has stated that a court may only apply the doctrine of *forum non conveniens* after it determines that it has jurisdiction. *See infra* note 13.

**9.** The court quoted Principle 21, which is substantially identical to Principle 2 of the Rio Declaration, cited *supra* note 7.

**10.** "Where pollution originating in a state has caused significant injury to persons outside

that state, or has created a significant risk of such injury, the state of origin is obligated to accord to the person injured or exposed to such risk access to the same judicial or administrative remedies as are available in similar circumstances to persons within the state."

**11.** After *Amlon* was decided, the Second Circuit issued its opinion in *Kadic v. Karadzic,* in which it gave substantial weight to the Restatement in ascertaining the scope of international law. *E.g.,* 70 F.3d at 240.

The Fifth Circuit also has had occasion to consider claims similar to those made in this case. Defendant repeatedly cites *Torres v. Southern Peru Copper Corp.*, 965 F.Supp. 895 (S.D.Tex.1995); 965 F.Supp. 899 (S.D.Tex.1996); *aff'd*, 113 F.3d 540 (5th Cir.1997), in which several hundred residents of Peru, not including the present plaintiffs, sued Southern Peru (also the defendant at bar) for personal injuries and property damage resulting from environmental pollution in the area of Ilo, Peru (the same area involved in the case at bar). 965 F.Supp. at 899, 901, 905. The plaintiffs in *Torres* asserted claims under state law in a Texas state court, and the defendants removed the case to federal district court. *Id.* at 896–97, 901. The district court found subject matter jurisdiction based on the federal common law of international relations, *id.* at 898–99, and then granted the defendants' motion to dismiss on the grounds of *forum non conveniens* and comity of nations, *id.* at 902–09. On the issue of comity of nations, the court noted that Peru regulated the challenged conduct, which occurred entirely in Peru, and concluded that exercising jurisdiction would interfere with Peru's "sovereign right to control its own environment and resources." *Id.* at 909.[12] The Fifth Circuit affirmed the district court's decisions, evaluating in depth the issue of subject matter jurisdiction and summarily approving the district court's resolution of the issues of *forum non conveniens* and comity of nations. 113 F.3d at 542–44.[13] In discussing the foreign policy issues that gave rise to federal subject matter jurisdiction, the court noted that the mining industry was critical to the economy of Peru, the Peruvian government had "participated substantially" in the activities for which Southern Peru was being sued, and the government extensively regulated the mining industry; the court concluded that the case implicated "Peru's sovereign interests by seeking damages for activities and policies in which the government actively has been engaged." *Id.* at 543.

Defendant makes much of the fact that the same lawyers who represent the plaintiffs in the present case also represented the plaintiffs in *Torres*. E.g., Tr. of Oral Arg., Oct. 29, 2001, at 12 ("This is the same lawsuit, the same lawsuit with the same allegations filed four years ago in Texas which was thrown out."), 24 ("My colleague, Mr. Shirrmeister, lost once. He has dressed up the same allegations and brought them again."), 68 ("These plaintiffs—this is not a claim preclusion argument, but it goes to the forum non conveniens argument—they had their opportunity."). Of course, as defendant concedes, preclusion principles do not prevent a lawyer from suing the same defendant more than once on behalf of different plaintiffs. Also, the plaintiffs in *Torres* raised claims only under state law, whereas the plaintiffs in the present case raise claims only under the ATCA and concomitant principles of international law. The district court in *Aguinda*, where ATCA claims were asserted, was presented with similar circumstances and relied heavily on the decision of the court in *Sequihua* in

---

**12.** In identifying factors relevant to the issue of comity, the court quoted from the Restatement (Third) of Foreign Relations Law, § 403, which sets forth limitations on a nation's jurisdiction to prescribe law with respect to persons or activities within another nation. 965 F.Supp. at 908. The issue of jurisdiction to prescribe law was implicated, because the plaintiffs in *Torres* had asserted

claims under Texas state law regarding pollution in Peru.

**13.** The court emphasized that "the doctrine of *forum non conveniens* can never apply if there is absence of jurisdiction or mistake of venue." *Id.* at 542, *quoting Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 504, 67 S.Ct. 839, 91 L.Ed. 1055 (1947).

its first decision granting the defendants' motion to dismiss on *forum non conveniens* grounds; the Second Circuit stated that such substantial reliance was inappropriate. 157 F.3d at 159 ("On remand, ... the District Court should independently reweigh the factors relevant to a forum non conveniens dismissal, rather than simply rely on *Sequihua.*").

More recently, the Fifth Circuit dealt directly with the viability of environmental claims under international law in *Beanal v. Freeport–McMoran, Inc.,* 197 F.3d 161 (5th Cir.1999), *aff'g* 969 F.Supp. 362 (E.D.La.1997). The plaintiff, a citizen of Indonesia, alleged that the defendant, a U.S. corporation, had engaged in mining operations in Indonesia causing harm to the environment and habitat of the Amungme tribe and further alleged that the defendant's security forces had violated the tribe's human rights, all in violation of international law. 197 F.3d at 163. The court of appeals analyzed the plaintiff's claims under three categories: individual human rights violations, genocide and cultural genocide, and environmental torts.

With regard to the plaintiff's claims of human rights violations, the court of appeals upheld the district court's determination that the complaint failed to allege definite facts and did not reach the question "whether state-action is required to sustain an action for individual human rights violation under the ATS." *Id.* at 166. On this point, the district court had held that "the acts of murder and torture are only actionable by proof of state action," unless they are "committed as acts of genocide." 969 F.Supp. at 371 (relying primarily upon the Second Circuit's opinion in *Kadic v. Karadzic* ).

With regard to the plaintiff's claims of genocide and cultural genocide, the court of appeals upheld the district court's determination that the complaint failed to allege definite facts of genocide and approved the district court's holding that cultural genocide is not prohibited under customary international law. 197 F.3d at 167–68. The court considered the documents cited by the plaintiff, principally the International Covenant on Civil and Political Rights, the International Covenant on Economic Social and Cultural Rights, and the Universal Declaration on Human Rights, and decided that they proclaim "an amorphous right to 'enjoy culture,' or a right to 'freely pursue' culture, or a right to cultural development .... [but] nonetheless fail to proscribe or identify conduct that would constitute an act of cultural genocide." *Id.* at 168 (footnote citing sources omitted). The court concluded:

[I]t would be problematic to apply these vague and declaratory international documents to Beanal's claim because they are devoid of discernable means to define or identify conduct that constitutes a violation of international law. Furthermore, Beanal has not demonstrated that cultural genocide has achieved universal acceptance as a discrete violation of international law. Thus, it would be imprudent for a United States tribunal to declare an amorphous cause of action under international law that has failed to garner universal acceptance.

*Id.*

Finally, the court of appeals upheld the district court's determination that the plaintiff had failed to allege environmental torts in violation of international law. *Id.* at 166–67. The plaintiff alleged that the defendant had dumped large quantities of mine tailings in rivers near the plaintiff's home, causing the water to be unsuitable for bathing and drinking, destroying vegetation, contaminating aquatic life, and creating a high risk of floods and landslides. *Id.* at 166. The plaintiff cited several documents as evidence of international law prohibiting the defendant's actions, relying

principally on a book by Professor Phillipe Sands of New York University School of Law and the Rio Declaration. *Id.* at 167. The Fifth Circuit held that the plaintiff had not demonstrated the existence of a rule of international law applicable to the alleged actions, explaining:

> Beanal fails to show that these treaties and agreements enjoy universal acceptance in the international community. The sources of international law cited by Beanal and the *amici* merely refer to a general sense of environmental responsibility and state abstract rights and liberties devoid of articulable or discernable standards and regulations to identify practices that constitute international environmental abuses or torts.... [F]ederal courts should exercise extreme caution when adjudicating environmental claims under international law to insure that environmental policies of the United States do not displace environmental policies of other governments. Furthermore, the argument to abstain from interfering in a sovereign's environmental practices carries persuasive force especially when the alleged environmental torts and abuses occur within the sovereign's borders and do not affect neighboring countries.

*Id.* The court noted that the "express language of the [Rio] declaration appears to cut against Beanal's claims." *Id.* at 167 n. 6.

Plaintiffs attempt to distinguish the present case from those discussed above by characterizing their claims as based on human rights law, rather than environmental law, and by pointing to the specific rights they invoke, i.e. the right to life, right to health, and right to sustainable development. But the labels plaintiffs af-fix to their claims cannot be determinative. Severe environmental pollution necessarily has an impact on human life, and the cases discussed above all involved allegations of environmental pollution that had injured people or that risked injuring people. Furthermore, the international law sources considered in the above cases are relevant to plaintiff's claims in this case.

■ In addition to considering the above cases and the sources cited therein, I also have reviewed the voluminous international documents submitted by plaintiffs. I conclude that plaintiffs have not demonstrated that high levels of environmental pollution, causing harm to human life, health, and sustainable development within a nation's borders, violate any well-established rules of customary international law. While nations may generally agree that human life, health, and sustainable development are valuable and should be respected, and while there may be growing international concern over the impact of environmental pollution on humanity, plaintiffs have not demonstrated any general consensus among nations that a high level of pollution, causing harm to humans, is universally unacceptable.

Plaintiffs rely on several conventions and declarations which have been approved by many nations and which therefore provide strong evidence of the content of customary international law. These documents speak in terms of "rights," but they do not identify any prohibited conduct that is relevant to this case. For example, as evidence of the right to life, plaintiffs cite Article 3 of the Universal Declaration of Human Rights: "Everyone has the right to life, liberty and the security of person." G.A. Res. 217A, 3 U.N. GAOR, U.N. Doc. A/810, at 71 (1948).[14] As evi-

---

**14.** *See also, e.g.,* International Covenant on Civil and Political Rights, Dec. 9, 1966, art. 6(1), 999 U.N.T.S. 171; American Convention on Human Rights, art. 4(1), 1144 U.N.T.S. 123, O.A.S. T.S. No. 36 (1969); American Declaration of the Rights and Duties of Man, art. I, O.A.S. Res. XXX (1948), O.A.S. Off. Rec. OEA/Ser. L./V/I.4 Rev. (1965).

dence of the right to health, plaintiffs cite Article 25(1) of the Universal Declaration of Human Rights, "Everyone has the right to a standard of living adequate for the health and well-being of himself and of his family . . . .," and Article 12 of the International Covenant on Economic, Social, and Cultural Rights, "The States Parties to the present Covenant recognize the right of everyone to the enjoyment of the *highest attainable* standard of physical and mental health," 999 U.N.T.S. 3 (1966) (emphasis added).[15] As evidence of the right to sustainable development, plaintiffs cite the World Charter for Nature: "1. Nature shall be respected and its essential processes shall not be impaired. . . . 11. Activities which might have an impact on nature shall be controlled, and the *best available* technologies that minimize significant risks to nature or other adverse effects shall be used. . . ." G.A. Res. 37/7 (1982) (emphasis added).

In *Filartiga*, the Second Circuit stated that "there is no universal agreement as to the precise extent of the 'human rights and fundamental freedom' guaranteed to all by the [United Nations] Charter." 630 F.2d at 882. In that case, however, the court concluded that "there is at present no dissent from the view that the guaranties include, at a bare minimum, the right to be free from torture." 630 F.2d at 882. In finding that torture by governmental officials violates international law, the court relied in particular on the Universal Declaration of Human Rights, G.A. Res. 217(III)(A) (Dec. 10, 1948), adopted without dissent by the General Assembly of the United Nations, which states that "no one shall be subjected to torture," and the Declaration on the Protection of All Persons from Being Subjected to Torture, G.A. Res. 3452, 30 U.N. GAOR Supp. (No.

34) 91, U.N. Doc. A/1034 (1975), also adopted unanimously by the General Assembly, which prohibits any state from permitting official torture and is careful to include a painstaking and precise definition of "torture" ("any act by which severe pain and suffering, whether physical or mental, is intentionally inflicted by or at the instigation of a public official on a person for such purposes as . . . intimidating him or other persons"). 630 F.2d at 882–83; *see also Wiwa v. Royal Dutch Petroleum Co.*, No. 96 Civ. 8386 (KMW), 2002 WL 319887, at *10–13 (S.D.N.Y. Feb.28, 2002) (holding that "beating and shooting a civilian engaged in peaceful protest" violates "the right to life, liberty, and personal security" under well-established international law if the perpetrator is a state actor).

The plaintiffs in the present case rely principally on the general human rights principles that the court in *Filartiga* found insufficiently determinate, standing alone, to establish binding customary international law. Plaintiffs do not supplement those principles with sources demonstrating that there is "no dissent from the view" that certain levels of environmental pollution violate human rights under international law. Plaintiffs rely on some additional sources, which are less probative of the "general assent of civilized nations" than the conventions and declarations cited above, that acknowledge that the quality of the environment implicates human life and health but nevertheless do not identify conduct that is universally prohibited. *See, e.g.*, Report on the Situation of Human Rights in Ecuador, Ch. VIII, Inter–Am. C.H.R., OEA/Ser. L/V/II.96, Doc. 10, rev. 1 (Apr. 24, 1997) ("The realization of the right to life, and to physical security and integrity is necessarily related to and

---

**15.** *See also, e.g.*, American Declaration of the Rights and Duties of Man, *supra* note 14, art. XI.

in some ways dependent upon one's physical environment. Accordingly, where environmental contamination and degradation pose a persistent threat to human life and health, the foregoing rights are implicated."); *Case Concerning the Gabcikovo–Nagymaros Project (Hungary v. Slovakia)*, 1997 I.C.J. 204 (separate opinion of Vice–President Weeramantry) ("The protection of the environment is … a *sine qua non* for numerous human rights such as the right to health and the right to life itself.").[16] Plaintiffs also rely on some opinions of individual scholars that make a stronger statement of the rights to life, health, and sustainable development in an environmental context, but these opinions are even less probative of the existence of universal norms, especially considering the vigorous academic debate over the content of international law.[17]

If anything, nations generally agree that the appropriate balance between economic development and environmental protection is a matter that may be determined by each nation with respect to the land within its borders. Principle 1 of the Rio Declaration echoes the same general human rights principles cited by plaintiffs: "Human beings are at the centre of concerns for sustainable development. They are entitled to a healthy and productive life in harmony with nature." Principle 2 then proclaims:

> States have, in accordance with the Charter of the United Nations and the principles of international law, the sovereign right to exploit their own resources pursuant to their own environmental and developmental policies, and the responsibility to ensure that activities within their jurisdiction or control do not cause damage to the environment of other States or of areas beyond the limits of national jurisdiction.

---

**16.** Plaintiffs also cite a concurring opinion by a judge of the European Court of Human Rights, interpreting the European Convention for the Protection of Human Rights and Fundamental Freedoms:

> If information is withheld by a government about circumstances which foreseeably, and on substantial grounds, present a real risk of danger to health and physical integrity, then such a situation may also be protected by Article 2 of the Convention: 'No one shall be deprived of his life intentionally.'
>
> It may therefore be time for the Court's case-law on Article 2 (the right to life) to start evolving, to develop the respective implied rights, articulate situations of real and serious risk to life, or different aspects of the right to life.

*Guerra v. Italy*, 64 Eur. Ct. H.R. 210, 234 (1998) (Jambrek, J., concurring). This opinion shows that the rights to life and health are not yet well defined under the European Convention, let alone under customary international law.

**17.** The Second Circuit in *Filartiga* stated that courts should determine whether a rule is well-established and universally recognized by consulting, among other sources, " 'the works of jurists, writing professedly on public law.' " *Filartiga*, 630 F.2d at 880, *quoting United States v. Smith*, 18 U.S. (5 Wheat.) 153, 160–61, 5 L.Ed. 57 (1820). In this case, plaintiffs and defendant have submitted multiple affidavits by professors, explaining why or why not plaintiffs' claims are supported by customary international law. The affidavits serve essentially as supplemental briefs, providing arguments and citations which for the most part also appear in the parties' main briefs. I doubt that such academic exercises in advocacy are the sort of scholarly writings the Second Circuit had in mind when it identified the sources that could serve as evidence of customary international law. On the other hand, I consider the Restatement (Third) of Foreign Relations Law (1987), which was produced by a group of esteemed scholars without an eye to pending litigation, to be of significant value in ascertaining the well-established, universally recognized rules of international law. *See Kadic*, 70 F.3d at 240 (relying on Restatement in ascertaining scope of international law).

Thus, the Rio Declaration acknowledges that exploitation of the environment affects human life, health, and sustainable development; but it simultaneously recognizes the "sovereign right" of nations to control the level of environmental exploitation within their territories. *See Beanal,* 197 F.3d at 167 n. 6 ("Although Beanal cites the Rio Declaration to support his claims of environmental torts and abuses under international law, nonetheless, the express language of the declaration appears to cut against Beanal's claims.").

The Restatement (Third) of Foreign Relations Law (1987) supports the position that environmental pollution, within a nation's borders, that adversely affects human life or health does not violate any binding rules of international law. Section 601 describes a state's responsibilities with respect to the environment as follows:

(1) A state is obligated to take such measures as may be necessary, to the extent practicable under the circumstances, to ensure that activities within its jurisdiction or control

(a) conform to generally accepted international rules and standards for the prevention, reduction, and control of injury to the environment of another state or of areas beyond the limits of national jurisdiction; and

(b) are conducted so as not to cause significant injury to the environment of another state or of areas beyond the limits of national jurisdiction. . . .

Section 702 describes state actions that violate the international law of human rights as follows:

A state violates international law if, as a matter of state policy, it practices, encourages, or condones

(a) genocide,

(b) slavery or slave trade,

(c) the murder or causing the disappearance of individuals,

(d) torture or other cruel, inhuman, or degrading treatment or punishment,

(e) prolonged arbitrary detention,

(f) systematic racial discrimination, or

(g) a consistent pattern of gross violations of internationally recognized human rights.

The comment to Section 702 explains that "this section includes as customary law only those human rights whose status as customary law is generally accepted (as of 1987) and whose scope and content are generally agreed. . . . The list is not necessarily complete, and is not closed: human rights not listed in this section may have achieved the status of customary law, and some rights might achieve that status in the future." Thus, the Restatement does not foreclose the possibility that additional types of conduct may come to be recognized by the community of nations as violating international law. But plaintiffs have not demonstrated the development of any international consensus with regard to unacceptable levels of environmental pollution that even approaches the universal condemnation of the acts identified in the Restatement.

Plaintiffs concede that not every tort that causes injury to human life or health constitutes a violation of the law of nations. Tr. of Oral Arg. at 36. Plaintiffs suggest that, in order to distinguish ordinary torts from torts that violate international law, courts should "make a factual inquiry into whether the allegations rise to the level of egregiousness and intentionality required to state a claim under international law," taking into account the amount of harm caused and the existence of reasonable alternatives. *Id.* at 36, 46. Not surprisingly, plaintiffs' complaint alleges "willful and wanton behavior, depraved indifference, and/or gross negligence" on the part of Southern Peru and states that Southern Peru failed to use emission control devices

that were available and inexpensive. Compl. ¶¶ 28, 62, 63, 67, 68, 73, 74. Defendant, for its part, also invokes the "shockingly egregious" standard, prompting plaintiffs to urge that the conduct they allege really is "shockingly egregious": "The defendants have made a big point of saying that you can't violate an international right that is cognizable under the Alien Tort Claims Act unless that behavior is, quote, shockingly egregious.... I would submit that the allegations in this complaint are shockingly, shockingly egregious." Tr. of Oral Arg. at 30.

The phrase "shockingly egregious" first appeared in the Second Circuit's four-paragraph opinion in *Zapata v. Quinn*, 707 F.2d 691 (2d Cir.1983), which dealt with a claim that the New York State Lottery deprived the plaintiff of property without due process of law:

> Jurisdiction is lacking under 28 U.S.C. § 1350 (the "alien tort" statute), which applies only to *shockingly egregious* violations of universally recognized principles of international law, *see Filartiga v. Pena–Irala*, 630 F.2d 876 (2d Cir.1980) (torture). In any event Ms. Zapata clearly fails to state, even by the wildest stretch of imagination, a claim upon which relief can be granted.

*Id.* at 692 (emphasis added). That language was then quoted in the Fifth Circuit's opinion in *Beanal:*

> Nevertheless, "[i]t is only where the nations of the world have demonstrated that the wrong is of mutual and not merely several, concern, by means of express international accords, that a wrong generally recognized becomes an international law violation in the meaning of the [ATS]." *Filartiga*, 630 F.2d at 888. Thus, the ATS "applies only to *shockingly egregious* violations of universally recognized principles of international law." *See Zapata v. Quinn*, 707 F.2d 691, 692 (2d Cir.1983) (per curiam).

Beanal fails to show that these treaties and agreements enjoy universal acceptance in the international community. 197 F.3d at 167 (emphasis added). *Zapata* and *Beanal* did not establish "shockingly egregious" as an independent standard for determining what constitutes a violation of international law. Rather, both cases affirmed that the appropriate standard is whether a rule is universally accepted as international law. The courts in *Zapata* and *Beanal* recognized that because universal acceptance is a prerequisite to a rule becoming binding as customary international law, only rules prohibiting acts that are "shockingly egregious" are likely to attain that status.

■ It is important to bear in mind the Second Circuit's admonition in *Filartiga:* "The requirement that a rule command the 'general assent of civilized nations' to become binding upon them all is a stringent one. Were this not so, the courts of one nation might feel free to impose idiosyncratic legal rules upon others, in the name of applying international law." 630 F.2d at 881. Plaintiffs' suggested approach—a factual assessment to determine whether the defendant's alleged conduct is "shockingly egregious"—would displace the agreement of nations as the source of customary international law and substitute for it the consciences and sensibilities of individual judges. Life and health, those fundamental blessings of the human state, may be harmed or threatened by a great variety of wrongful conduct. It is not for judges, however humane and sensitive or callous and unfeeling, to determine which specific acts injuring life or health are so "egregious" that they become the subject of international law. The Law of Nations, as that phrase is used in 28 U.S.C. 1350, is declared by the Parliament of Nations, and not by judges, trial or appellate, of a particular nation. Thus it is for the nations of

the world to develop customary international law that identifies those horrific acts that should be universally prohibited. *See Benjamins v. British European Airways,* 572 F.2d 913, 915–916 (2d Cir.1978) (deciding that negligent conduct causing disastrous air crash and death of all 112 passengers, even if "wilful," is not prohibited by law of nations).

█ Even if certain conduct is universally prohibited, it is not necessarily incorporated into customary international law. The Second Circuit explained in *Filartiga:*

> [T]he mere fact that every nation's municipal law may prohibit theft does not incorporate "the Eighth Commandment, 'Thou Shalt not steal' . . . (into) the law of nations." It is only where the nations of the world have demonstrated that the wrong is of mutual, and not merely several, concern, by means of express international accords, that a wrong generally recognized becomes an international law violation within the meaning of the statute.

630 F.2d at 888 (quoting *IIT v. Vencap,* 519 F.2d 1001, 1015 (2d Cir.1975) (Friendly, J.)). Thus, a brutal murder may be shockingly egregious criminal conduct in the eyes of all the world but remain a matter for domestic law only. The express language of Principle 2 of the Rio Declaration indicates that nations view environmental pollution within a nation's borders as a matter best left entirely to domestic regulation.

Plaintiffs also urge the Court to give content to general human rights principles under international law in the same manner that federal courts interpret general principles of the Bill of Rights, such as "due process of law" and "freedom of speech." Surreply Brief at 4. In this vein, plaintiffs suggest that Principles 1 and 2 of the Rio Declaration should be read together to impose a reasonableness requirement on nations' exercise of their "sovereign right to exploit their own resources pursuant to their own environmental and developmental policies," such that a violation of international law occurs when a nation abuses its discretion. At oral argument, counsel for plaintiffs reasoned:

> The [Rio] declaration says that it is a matter for each state to determine *within reason* the bounds that it wants to take.
>
> It also states, your Honor, that, even within a country's borders, no state has the unfettered right to pursue economic development at whatever the cost to human beings. . . . And so when behavior as egregious as this results in a substantial, long-lived pattern of disease and death, the boundary has been crossed. *The state's discretion has been abused.*

Tr. of Oral Arg. at 34 (emphasis added).[18]

Once again, the approach advocated by plaintiffs diverts attention from universally accepted standards to concepts, such as "reasonableness," that are easily subject to differing interpretations by the courts of different nations. In the international system, there is no supreme court to reconcile conflicting interpretations and provide authoritative guidance on customary

---

**18.** Given this particular submission of counsel, it may be useful to quote again the exact language of the Rio Declaration, for purposes of comparison. Principle 1 states: "Human beings are at the centre of concerns for sustainable development. They are entitled to a healthy and productive life in harmony with nature." Principle 2 states: "States have, in accordance with the Charter of the United Nations and the principles of international law, the sovereign right to exploit their own resources pursuant to their own environmental and developmental policies, and the responsibility to ensure that activities within their jurisdiction or control do not cause damage to the environment of other States or of areas beyond the limits of national jurisdiction."

international law. Thus, reliance on broad concepts in ascertaining the content of customary international law would be especially problematic. Plaintiffs' suggestion that the court read implied limitations on the express language of the Rio Declaration is also inappropriate. The express language of the Rio Declaration was approved by many nations; the implied limitations proposed by plaintiffs have not been universally accepted.

■ While it is not necessary for nations to identify with specificity every factual scenario that violates a particular prohibition under international law, a rule of customary international law must nevertheless be "sufficiently determinate" to make it clear that particular conduct is prohibited. *Filartiga*, 630 F.2d at 880. For example, nations have universally agreed that torture violates international law, and this prohibition is sufficiently determinate to serve as a basis for suit. *See id.* at 884 ("The prohibition is clear and unambiguous . . . ."). By contrast, the "rights" articulated in the documents submitted by plaintiffs are not sufficiently determinate to show that the nations of the world universally prohibit the sort of conduct that plaintiffs allege in this case.

In conclusion, plaintiffs have not demonstrated that high levels of environmental pollution within a nation's borders, causing harm to human life, health, and development, violate "well-established, universally recognized norms of international law." *Filartiga*, 630 F.2d at 888. Since I find no prohibition under international law dealing with environmental conduct within a nation's borders, I need not decide whether such a prohibition would apply to private actors as well as state actors, nor need I decide whether plaintiffs have alleged sufficient facts to support a finding that Southern Peru was a state actor.[19] Defendant's motion to dismiss for lack of federal subject matter jurisdiction and failure to state a claim is granted.[20]

## II.  *Forum Non Conveniens*

Having concluded in Part I that the Court lacks subject matter jurisdiction because plaintiffs' amended complaint does not state a viable claim under ATCA, I

**19.** The Second Circuit held in *Kadic* that certain actions, such as torture, violate international law only when committed by state actors, while other actions, such as piracy and slave trade, violate international law "whether undertaken by those acting under the auspices of a state or only as private individuals." 70 F.3d at 239–40; *see also Wiwa*, 2002 WL 319887, at *12–13 ("[T]he crimes against humanity plaintiffs allege—summary execution, arbitrary imprisonment, and persecution of a group based on political grounds—all fall squarely within the category of international law violations that require a showing of state action, pursuant to *Kadic I*."). The court in *Kadic* relied on civil rights jurisprudence under 42 U.S.C. § 1983 as "a relevant guide to whether a defendant has engaged in official action for purposes of jurisdiction under the Alien Tort Act." *Id.* at 245. "A private individual acts under color of law within the meaning of section 1983 when he acts together with state officials or with significant state

aid." *Id.* In *Torres*, the Fifth Circuit stated that "the Peruvian government has participated substantially in the activities for which SPCC is being sued." 113 F.3d at 543. It is not necessary to decide whether the facts presented by the parties in this case support the same conclusion.

**20.** Plaintiffs asserted jurisdiction under the ATCA and 28 U.S.C. § 1331. Plaintiffs concede that if jurisdiction is lacking under the ATCA because of failure to state a claim under international law, then jurisdiction is also lacking under § 1331 in this case. Tr. of Oral Arg. at 48.

I note that the court in *Torres* found federal jurisdiction over the state law claims in that case based on the federal common law of international relations. 113 F.3d at 542–43. Since plaintiffs have not stated any claims that survive defendant's motion to dismiss, I need not consider whether that alternative basis for jurisdiction applies here.

need not rule upon defendant's alternative basis for dismissal, the doctrine of *forum non conveniens*. Nevertheless, I think it is useful for this Court to address the issue.

Plaintiffs will in all likelihood appeal the dismissal of their action. If the Court of Appeals affirms this Court's dismissal on the ATCA ground, then that ends the case, barring possible Supreme Court review. But if the Court of Appeals reverses the dismissal on the ATCA ground, judicial efficiency may be served by making the Court of Appeals aware at this time of this Court's views on *forum non conveniens,* so that the Court of Appeals, if so inclined, can consider that issue as well, thereby disposing of the case on one appeal rather than two.[21]

Ordinarily, I suppose, judges should refrain from uttering what may prove to be elaborate *dicta;* but the present circumstances, to my mind at least, justify the exercise.

### A. *General Principles*

In *Bank of Credit and Commerce International (OVERSEAS) Ltd. v. State Bank of Pakistan,* 273 F.3d 241 (2d Cir.2001), the Second Circuit furnished a recent overview of the principles governing *forum non conveniens:*

> The first step in a *forum non conveniens* analysis is for the court to establish the existence of an adequate alternative forum. An alternative forum is generally adequate if: (1) the defendants are subject to service of process there; and (2) the forum permits litigation of the subject matter of the dispute. It follows that an adequate forum does not exist if a statute of limitations bars the bringing of the case in that forum.

After concluding that an adequate alternative forum exists, the court must weigh the public and private interests identified in *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), in order to determine which forum will be most convenient and will best serve the ends of justice. The defendant bears the burden of proof on all elements of the motion, and great weight is given to the plaintiff's choice of forum.

273 F.3d at 246 (citations, other than to *Gulf Oil Corp. v. Gilbert,* and internal quotation marks omitted).

Any plaintiff resisting a defendant's *forum non conveniens* motion naturally stresses the deference—if not to say the sanctity—to be accorded his choice of forum. The plaintiffs at bar are no exception. And indeed, in *DiRienzo v. Philip Services Corp.,* 232 F.3d 49, 56–57 (2d Cir.2000), the Second Circuit said that to succeed on *forum non conveniens* a defendant, having first shown the existence of an adequate alternative forum, "must next demonstrate that the ordinarily strong presumption favoring the plaintiff's chosen forum is countered by the private and public interest factors set out in *Gilbert,* which weigh so heavily in favor of the foreign forum that they overcome the presumption for plaintiffs' choice of forum." To support that proposition *DiRienzo* quoted *Gilbert,* 330 U.S. at 508, 67 S.Ct. 839: "[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."

In *DiRienzo* the Second Circuit rejected the *forum non conveniens* effort of Canadian defendants, joined with one United States defendant, to dismiss, in favor of

---

**21.** Of course, I do not have the temerity to suggest that the Court of Appeals should pro-

ceed in this fashion.

the Canadian courts, actions commenced in United States courts by American residents. More recently, in an *en banc* decision, the Second Circuit considered at greater length the deference to be given a plaintiff's choice of forum. *See Iragorri v. United Technologies Corp.,* 274 F.3d 65 (2d Cir. Dec.4, 2001). The precise question before the *en banc* Court in *Iragorri* was "what degree of deference should the district court accord to a United States plaintiff's choice of a United States forum where that forum is different from the one in which the plaintiff resides." 274 F.3d at 69. That particular question does not arise in the case at bar, since plaintiffs are citizens and residents of Peru. Nonetheless, in *Iragorri* the Court of Appeals spoke in terms applicable to a broader spectrum of cases. Accordingly it is instructive to quote the *Iragorri* opinion at some length.

The Second Circuit began its analysis with a review of Supreme Court *forum non conveniens* cases and then said:

> We regard the Supreme Court's instructions that (1) a plaintiff's choice of her home forum should be given great deference, while (2) a foreign resident's choice of a U.S. forum should receive less consideration, as representing consistent applications of a broader principle under which *the degree of deference to be given to a plaintiff's choice of forum moves on a sliding scale depending on several relevant considerations.*

274 F.3d at 71 (emphasis added). Foremost among those considerations, in the view of the *Iragorri* court, is whether a plaintiff chose a particular forum for genuine convenience or for tactical advantage. The Second Circuit addressed the interplay of those two considerations in this extended analysis:

> The more it appears that a domestic or foreign plaintiff's choice of forum has been dictated by reasons that the law

recognizes as valid, the greater the deference that will be given to the plaintiff's forum choice. Stated differently, the greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for *forum non conveniens.* Thus, factors that argue against *forum non conveniens* dismissal include the convenience of the plaintiff's residence in relation to the chosen forum, the availability of witnesses or evidence to the forum district, the defendant's amenability to suit in the forum district, the availability of proper legal assistance, and other reasons relating to convenience or expense. On the other hand, the more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons—such as attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, the habitual generosity of juries in the United States or in the forum district, the plaintiff's popularity or the defendant's unpopularity in the region, or the inconvenience and expense to the defendant resulting from litigation in that forum—the less deference the plaintiff's choice commands and, consequently, the easier it becomes for the defendant to succeed on a *forum on conveniens* motion by showing that convenience would be better served by litigating in another country's courts.

274 F.3d at 71–72 (footnotes omitted).

In its continuing discussion, the *Iragorri* court made it plain that the degree of deference given to a plaintiff's choice of forum was not decisive of a *forum non conveniens* motion. "It is only the first level of inquiry," 274 F.3d at 73, so that "[e]ven after determining whether the

plaintiff's choice is entitled to more or less deference, a district court must still conduct the analysis set out in *Gilbert, Koster,* and *Piper* [three Supreme Court decisions]. Initially, the court must consider whether an adequate alternative forum exists. If so, it must balance two sets of factors to ascertain whether the case should be adjudicated in the plaintiff's chosen forum or in the alternative forum proposed by the defendant." *Id.*

■ The "two sets of factors" to which the Second Circuit referred in *Iragorri* are known as the "private interest factors" and the "public interest factors," following the nomenclature employed by the Supreme Court in the seminal case of *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). Private interest factors focus upon the convenience of the litigants, and include "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Id.* at 508, 67 S.Ct. 839. As for public interest factors, the Court said in *Gilbert* at 508–09, 67 S.Ct. 839:

> Factors of public interest also have place in applying the doctrine. Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation. In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home. There is an appropriateness, too, in hav-

ing the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.

■ While the references in *Gilbert* to "a diversity case" and "the state law" governing the case suggest a choice between the courts of two states of the United States, it is well settled that the *forum non conveniens* factors articulated in *Gilbert* apply where the proposed alternative forum is in a foreign country. *See, e.g., Alcoa Steamship Co. v. M/V Nordic Regent,* 654 F.2d 147 (2d Cir.1980) (*en banc*) (applying *Gilbert* factors in admiralty action; complaint filed in Southern District of New York dismissed on *forum non conveniens* grounds in favor of courts of Trinidad).

### B. The Case at Bar

#### 1. Whether an ATCA Claim Precludes Application of Forum Non Conveniens

At the outset, I must take account of plaintiffs' threshold argument that the *forum non conveniens* doctrine does not apply to an action where the ACTA confers subject matter jurisdiction upon a district court. Plaintiffs do not assert this proposition in the text of their brief, confining it to an extended footnote, but they make the argument clearly enough there, *see* Opp. Brief at 21 n. 12 ("There is authority for the contention that it is inconsistent with the purpose of the Alien Tort Claims Act to even apply the doctrine of *forum non conveniens* to ACTA claims.... Such holdings mandate the conclusion that the doctrine of *forum non conveniens* does not apply to cases brought pursuant to the ATCA.") (citations omitted), and reiterated it at oral argument on the motion, *see* Tr. at 62 ("I think there is a very good argument that *forum non conveniens* should

not even apply" to an action brought under the ATCA.).[22] I deal with this contention first, since if plaintiffs are correct that the ATCA renders *forum non conveniens* inapplicable, there is no need to engage in a *forum non conveniens* analysis.

▮ I decline to hold that a case properly brought under the ATCA is immune from *forum non conveniens* analysis. No Second Circuit case reaches that result. On the contrary, counsel's concession at oral argument that "*forum non conveniens* may be considered by the Court in an Alien Tort Claims Act case," *see supra* note 22, is closer to the mark. In *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88 (2d Cir.2000), upon which plaintiffs at bar place a principal reliance, the plaintiff's claim lay under the ATCA as supplemented in 1991 by the Torture Victim Prevention Act (TVPA), 28 U.S.C. § 1350 App. The Second Circuit reversed the district court's *forum non conveniens* dismissal in favor of the courts of the United Kingdom and remanded the case to the district court for a more careful analysis of the traditional *forum non conveniens* factors. The *Wiwa* court stated its view that "in passing the Torture Victim Prevention Act, Congress has expressed a policy of U.S. law favoring the adjudication of such suits in U.S. courts," but took the trouble to add:

> This is not to suggest that the TVPA has nullified, or even significantly diminished, the doctrine of *forum non conveniens*. The statute has, however, communicated a policy that such suits should not be facilely dismissed on the assumption that the ostensibly foreign controversy is not our business. The TVPA in our view expresses a policy favoring our

courts' exercise of the jurisdiction conferred by the ATCA in cases of torture unless the defendant has fully met the burden of showing that the *Gilbert* factors tilt strongly in favor of trial in the foreign forum.

226 F.3d at 106 (citation and internal quotation marks omitted). Thus in *Wiwa* the Second Circuit squarely rejected the notion, even in cases of torture, that the *forum non conveniens* doctrine is asphyxiated by the rarefied ATCA atmosphere. On the contrary, the doctrine breathes, perhaps even with a strength not "significantly diminished"; and certain it is that the court of appeals instructed the district court, on remand of *Wiwa's* ACTA–TVPA torture action, to submit the case to traditional *forum non conveniens* analysis. The most comfort plaintiffs can derive from the quoted discussion in *Wiwa* is a suggestion that when the Second Circuit used the phrase "*fully* met" with reference to the defendant's burden, instead of just saying "met," the court implied without stating directly that a defendant in a TVPA case bore an enhanced *forum non conveniens* burden. But this interpretation is Delphic at best, and I am not at all sure that the court of appeals intended that implication. In any event, *Wiwa* cannot possibly be read to hold that *forum non conveniens* does not apply at all to ACTA–TVPA cases.

The other recent Second Circuit decision that resonates on this particular point is *Jota*, 157 F.3d 153. As I observed in Part I, *supra*, the plaintiffs in *Jota*, who like those at bar invoked the ATCA as the basis for subject matter jurisdiction, alleged the commission by Texaco of environmental torts against resi-

---

22. That contention was voiced at oral argument on October 29, 2001 by Mr. Schirrmeister, co-counsel for plaintiffs, who was left to deal with the earlier concession of his colleague, Mr. Showman, responding in these words to a question by the Court: "Under

Second Circuit law; *forum non conveniens* may be considered by the Court in an Alien Tort Claims Act case." Tr. at 47. Mr. Schirrmeister's argument *contra* at the hearing mirrored the contentions made in footnote 12 in the plaintiffs' brief.

dents of Ecuador that closely resemble the environmental torts the Peruvian plaintiffs at bar allege against Southern Peru. District Judge Rakoff had dismissed the complaint on grounds of *forum non conveniens* in favor of the courts of Ecuador, international comity, and failure to join an indispensable party. Reversing on the *forum non conveniens* ground, the Second Circuit said:

> We hold that dismissal on the ground of *forum non conveniens* was erroneous in the absence of a condition requiring Texaco to submit to jurisdiction in Ecuador and that the dismissal on this ground improperly rested entirely on adoption of another district court's weighing of the relevant factors in litigation that is arguably distinguishable.[23]

157 F.3d at 157. Accordingly the court of appeals remanded the case to Judge Rakoff for further *forum non conveniens* analysis. In doing so, Judge Newman's opinion took care to observe in a footnote that the Second Circuit "express[ed] no view on"

> whether the plaintiffs have alleged conduct by Texaco that violates the law of nations, whether an ATA suit for environmental misconduct, alleged to violate the law of nations, may be brought against a non-governmental entity under the ATA, or *how the forum non conveniens balance for ATA claims is to be struck when alien plaintiffs select a United States forum for a suit against a domestic corporation. Cf. Kadic v. Karadzic,* 70 F.3d 232, 241–44 (2d Cir.1995)

(upholding jurisdiction over ATA claim against individual for alleged violations of law of nations involving genocide, war claims, and violations of humanitarian law, and rejecting *forum non conveniens* defense in suit against individual alien).

157 F.3d at 159 n. 6 (emphasis added).

On remand, therefore, Judge Rakoff was at liberty to reach his own conclusions on the questions the court of appeals expressly declined to decide, including whether the presence of an ATCA claim had any effect upon traditional *forum non conveniens* analysis.

In his opinion following remand, *Aguinda v. Texaco, Inc.,* 142 F.Supp.2d 534 (S.D.N.Y.2001), Judge Rakoff again dismissed the complaint, this time solely upon the ground of *forum non conveniens.* During oral argument on the present motion, which took place five months after Judge Rakoff filed his opinion on remand, counsel for plaintiffs at bar stated that in *Jota* "the Second Circuit made mention of the fact that the plaintiffs had suggested that *forum non conveniens* should not be available in an Alien Tort Claims Act case and that the plaintiff should bring that to the attention of [the] district court," but then inexplicably added: "Judge Rakoff's decision does not address it." Tr. at 62. In point of fact, Judge Rakoff addressed at length and in scholarly detail the effect *vel non* of an ATCA claim upon the doctrine of *forum non conveniens, see* 142 F.Supp.2d at 552–554, and dismissed the complaint on the basis of the doctrine.[24]

---

**23.** The court of appeals was referring to *Sequihua v. Texaco,* 847 F.Supp. 61 (S.D.Tex. 1994).

**24.** Notwithstanding the cases plaintiffs at bar cite in footnote 12 of their brief, the greater weight of authority in other circuits appears to favor the application of *forum non conveniens* to ATCA cases. After a comprehensive review, Judge Rakoff said in *Aguinda,* 142

F.Supp.2d at 553: "Accordingly, courts have applied *forum non conveniens* analysis to cases involving claims brought under the ATCA in essentially the same manner as applied to all other cases," and cited for that proposition, among other decisions, *In re Estate of Ferdinand E. Marcos Human Rights Litig.,* 978 F.2d 493, 500 (9th Cir.1992) ("Such limitations as venue and the doctrine

An appeal from Judge Rakoff's dismissal of *Aguinda* is pending, and may very well lead to further elucidation by the Second Circuit. For the present, however, the decisions of the Second Circuit furnish no authority for the plaintiffs' argument that the presence of an ATCA claim in a complaint renders the doctrine of *forum non conveniens* entirely inapplicable to the case. Quite to the contrary: Second Circuit precedent, which of course I am bound to follow, seems to point in precisely the opposite direction. Therefore I reject the plaintiffs' contention that as a matter of law the *forum non conveniens* doctrine cannot be applied to this ATCA case.

### 2. Burden of Proof

A defendant such as Southern Peru, moving to dismiss a complaint on the ground of *forum non conveniens*, "bears the burden of proof on all elements of the motion." *Bank of Credit and Commerce Int'l (OVERSEAS) Ltd. v. State Bank of Pakistan*, 273 F.3d 241, 246 (2d Cir.2001) (citation omitted). "To prevail on a *forum non conveniens* motion to dismiss, the defendant must show as a threshold matter that an adequate alternative forum exists." *DiRienzo v. Philip Servs. Corp.* 232 F.3d 49, 56 (2d Cir.2000).

### 3. The Adequacy of the Courts of Peru as an Alternative Forum

"The first step in a *forum non conveniens* analysis is for the court to establish the existence of an adequate alternative forum.... After concluding that an adequate alternative forum exists, the court must weigh the public and private interests identified in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)." *Bank of Credit and Commerce*, 273 F.3d at 246 (one citation omitted). The question in the case at bar is whether the courts of Peru furnish an

adequate alternative forum for the claims the plaintiffs assert in their complaint. As noted in Part II.B.2., Southern Peru bears the burden of proof on this question.

The Second Circuit has recently said that "[a]n alternative forum is generally adequate if: (1) the defendants are subject to service of process there; and (2) the forum permits litigation of the subject matter of the dispute." *Bank of Credit and Commerce*, 273 F.3d at 246 (citations and internal quotation marks omitted).

In a prior opinion in the case at bar, reported at 2002 WL 221608 (Feb. 13, 2002), I referred to plaintiffs' contention that "legal counsel is unavailable in Peru to these plaintiffs" because, according to the affidavit of an attorney practicing in Ilò, Peru, Peruvian attorneys do not take cases for plaintiffs on a contingent fee basis, and in view of the indigence of the plaintiffs at bar, "none of them can afford to retain legal counsel in Peru or bear the initial costs of litigation." 2002 WL 221608 at *1. Counsel were directed to submit further briefs on this issue and have done so. Although earlier district court opinions have regarded plaintiffs' reduced financial circumstances and the unavailability of contingent fees as bearing upon the adequacy or availability of the suggested alternative forum, *see McKrell v. Penta Hotels (Fr.), S.A.*, 703 F.Supp. 13, 14 (S.D.N.Y.1989); *Agyenkwa v. Am. Motors Corp.*, 622 F.Supp. 242, 245 (E.D.N.Y. 1985); *Fiorenza v. United States Steel Int'l, Ltd.*, 311 F.Supp. 117, 120 (S.D.N.Y. 1969), more recently in *Murray v. British Broadcasting Corp.*, 81 F.3d 287, 292–93 (2d Cir.1996), the Second Circuit made it plain that a plaintiff's "claim of financial hardship may not be considered in determining the *availability* of an alternative forum but must be deferred to the balancing of interests relative to the forum's

of *forum non conveniens* are available in

[ATCA] cases as in any other.").

convenience" (emphasis in original). Accordingly I will consider the adequacy of the Peruvian courts as an alternative forum in light of the considerations the Second Circuit identified in *Bank of Credit and Commerce*.

There appears to be no dispute that Southern Peru is subject to the service of process by the Peruvian courts, thereby satisfying the first of the two requirements identified in *Bank of Credit and Commerce*. Hans A. Flury, a resident of Peru, member of the Peruvian bar, and general counsel of Southern Peru, avers in his affidavit that "Southern Peru Copper's activities in Peru are subject to the jurisdiction of the courts of the Republic of Peru." Flury Aff. verified Feb. 28, 2001 ("Flury Aff. I"), ¶ 11. Plaintiffs do not contradict that assertion. Moreover, if there were any doubt on the point, and as Southern Peru correctly acknowledges in its main brief at 20–21, "the Court may ensure that this requirement is satisfied by conditioning its dismissal of this action on SPCC's agreement to submit to the personal jurisdiction of a Peruvian court with appropriate subject matter jurisdiction," citing *Jota*, 157 F.3d at 159.

To satisfy the second requirement, that Peruvian courts permit litigation of the subject matter of plaintiffs' claims, Southern Peru submits the affidavits of two qualified experts: Roberto G. MacLean and Jorge Avendaño V.

MacLean is a citizen of Peru who has been licensed to practice law in Peru for 46 years. In addition to private practice, MacLean has served as a Justice on the Supreme Court of Peru and as ambassador of Peru to the United States, taught private international law and comparative law at universities in Peru, the United States, and Great Britain, and been the dean of the Law School of the Catholic University of Peru. MacLean Aff. verified Feb. 22, 2001 ("MacLean Aff."), ¶ 1.

MacLean read plaintiffs' complaint. MacLean Aff. ¶ 12. He notes that "[t]he Peruvian Legal System—like the rest of Latin America—is part of the family of systems of Roman Civil Law," *id.* ¶ 6, that although "Roman Law Systems, in general, and Peruvian Law in particular, do not use the concept of Torts or the classification thereof as they are known in the common law, they have equivalent concepts," which MacLean describes with reference to the pertinent provisions of the Peruvian Civil Code, *id.* ¶ 9. MacLean avers that in accordance with cited provisions of the Civil Code, "any person that [*sic* ] has suffered a personal injury or damage to property caused by an intentional or negligent act of another may bring an action to recover damages." *Id.* In addition, the Civil Code "provides a cause of action for damages caused by risky or dangerous activities." *Id.* MacLean concludes: "I am of the opinion that the plaintiffs may bring, based on the same facts, claims for damages against Southern Peru Copper Corporation in the Peruvian courts and, if such claims are meritorious, obtain damages as a relief." *Id.* ¶ 12.

Avendaño is a Peruvian citizen who received his Peruvian law degree in 1956, was admitted to the Bar of Lima in 1957, and since then has been a private practitioner. He has served thirteen years as a law school dean and between 1995 and 2000 was a member of the Peruvian Congress, in the party opposing then-President Alberto Fujimori. Avendaño Aff. verified Feb. 28, 2001 ("Avendaño Aff. I"), ¶¶ 1–4. Avendaño's affidavit gives a more detailed analysis of the Peruvian Civil Code than did MacLean's. *Id.* ¶¶ 12–31. Avendaño read the complaint of plaintiffs at bar. *Id.* ¶ 6. Based upon the pertinent provisions of the Civil Code, Avendaño opines that "the facts alleged in the Amended Complaint state a cause of action

under Peruvian law and, consequently, the plaintiffs in that case would be entitled to a remedy under Peruvian law if their claims are meritorious." *Id.* ¶ 43.

The conclusions of MacLean and Avendaño that Peruvian law would permit plaintiffs to litigate their claims against Southern Peru in the courts of Peru are corroborated by the actual experience described by Flury, the company's general counsel. At the time Flury verified his affidavit (February 28, 2001), Southern Peru was a defendant in "at least 33" of "the approximately 81 cases pending before Peruvian courts to which Southern Peru Copper is a party." Flury Aff. I ¶ 13. More to the point, "Southern Peru Copper has been subject to litigation over environmental claims which are similar in nature to the claims of the plaintiffs in this case." *Id.* ¶ 14. Specifically, on two occasions in the 1990s the mayor of the Province of Tacna, "a territorial subdivision south of Ilo," *id.* ¶ 15, filed actions in a Peruvian court against Southern Peru, first "to enjoin the Company from discharging mine tailings into the sea," *id.*, and second, "allegedly on behalf of the municipality and people of Tacna, seeking U.S. $100 million as compensation for alleged environmental damages from various aspects of Southern Peru Copper's operations," *id.* ¶ 16. In the first action the Supreme Court of Peru ruled against Southern Peru and ordered the company "to take action to prevent the discharge of mine tailings into the sea," an injunction with which the company complied at a cost "of approximately US$60 million." *Id.* ¶ 15. The second action was ultimately dismissed, but not before an intermediate

appellate court reversed the lower court's initial dismissal and the Supreme Court denied discretionary review; the lower court's subsequent dismissal was based "on different grounds," and was upheld on appeal. *Id.* ¶ 16.[25]

Both MacLean, Aff. ¶ 9, and Avendaño, Aff. I ¶ 26, state that the Peruvian statute of limitations for "extra-contractual liability" claims such as those alleged by plaintiffs is two years. Avendaño also notes that "Peruvian law does not recognize the concept of punitive or exemplary damages, according to which a sum that the defendant is ordered to pay to the victim is not based on the notion or [*sic*] remedying the damage but rather that of punishing the defendant, regardless of quantification of the damage." Avendaño Aff. I ¶ 23. However, he states that the "indemnification" provided for by the Civil Code in the event of a finding of liability:

comprises all of the consequences originating from the act or omission that caused the damage, including lost profits, damages to the person and moral damages, as long as there is adequate causation between the [act or omission] and the damage. The amount of the indemnification accrues legal interest from the date when the damage was caused.... [T]he indemnification comprises not only actual damages (*dammum emergens*), the existence and amount of which must be proven by the plaintiff, but also lost profits (*lucrum cessans*), which includes whatever the plaintiff has failed or will fail to receive as a result of the tortious act. While actual damages represent the impover-

---

**25.** The Flury and Avendaño affidavits also describe various regulatory and administrative remedies that may be pursued in Peru to address conduct of mining companies injurious to the environment. I do not consider those remedies in this *forum non conveniens* analysis. Plaintiffs do not wish to initiate an administrative or regulatory proceeding against Southern Peru. They want to sue Southern Peru in a court of law. The present question is whether plaintiffs can sue Southern Peru in the Peruvian courts and obtain a remedy if their claims are proven to be meritorious.

ishment of the victim, lost profits represent the obstacle placed by the tortious act on the victim's legitimate enrichment.

*Id.* ¶¶ 19, 20.

Unless plaintiffs persuasively counter this evidence, Southern Peru has clearly demonstrated that the Peruvian forum "permits litigation of the subject matter of the dispute," the second of the two requirements the Second Circuit articulated in *Bank of Credit and Commerce.*[26]

Plaintiffs at bar do not attempt a direct refutation of Southern Peru's evidence of the availability and adequacy of the Peruvian courts as an alternative forum. They make two rather different arguments. First, plaintiffs argue that "Peru is not an adequate alternative forum because justice is for sale in Peru." Opp. Brief at 23. That eye-catching, eyebrow-raising accusation is lifted, *sans* quotation marks, from the affidavit of Luis Francisco Arteta Infantas, a non-lawyer who was Southern Peru's supervisor of labor relations at a mine in Toquepala, Peru at the time he left the company's employ in 1992.

Arteta Infantas served for 10 years in the Peruvian Ministry of Labor before joining Southern Peru in October 1974. Arteta Infantas Aff. verified May 8, 2001, ¶¶ 1, 2. Arteta Infantas was active in the company's labor relations and personnel departments at the mine at Toquepala, Peru, eventually attaining the position of supervisor of the labor relations department. He acquired knowledge of "all the

administrative and judicial labor proceedings" against Southern Peru, his responsibility being "to attend to direct claims or lawsuits or labor allegations, and to report them immediately to [his] superiors." *Id.* ¶ 4. Arteta Infantas undertakes to describe "the corrupt practices used by SPCC such as bribery and graft of public officials to exert influence and control over the Peruvian courts." *Id.* ¶ 5. Arteta Infantas says that the company analyzes each lawsuit against it; if the suit is considered unimportant, "an agreement is reached to accept judicial verdict against the company only for purposes of appearances and to maintain a public image that SPCC knows how to lose, and it submits to, and respects the decisions of the Peruvian Judicial Branch"; but if a lawsuit "is important and dangerous and could have repercussions to its interests," then "Outside Legal Counsel" are retained whose sole objective is "to influence the judges' opinions and obtain results favorable" to Southern Peru, which the retained lawyers accomplish by "tak[ing] charge of negotiating that the verdicts of the judges be favorable to the interests of SPCC." *Id.* Arteta Infantas also describes various ways in which the company seeks favor with judges through entertainment, payment for travel expenses and medical expenses, and other inducements. Arteta Infantas asserts: "[K]nowing the practices of corruption that SPCC uses to influence decisions of the Judicial Branch in Peru and to obtain favorable verdicts, ... it would be impossi-

---

**26.** While the punitive damages plaintiffs at bar seek in their complaint are unavailable under Peruvian law, that does not demonstrate that the Peruvian courts are not an "available" forum for purposes of *forum non conveniens* analysis. In *PT United Can Co. v. Crown Cork & Seal Co.,* 138 F.3d 65 (2d Cir.1998), the Second Circuit rejected plaintiff's argument based upon the unavailability in the suggested alternate forum of Indonesia of treble damages under RICO, holding that

"[c]ontrary to UCC's assertion, the nonexistence of a RICO statute there does not, by itself, preclude the use of another forum," *id.* at 74 (citations omitted), an application of the previously expressed principles that "[a] forum is not inadequate even if the foreign justice system differs from that of the United States" and "[t]he availability of an adequate alternative forum does not depend on the existence of the identical cause of action in the other forum," *id.* at 73, 74.

ble for the plaintiffs to compete against SPCC due to its undeniable economic power and a partial Judicial Branch." *Id.* ¶ 6. Arteta Infantas concludes that "from my personal experience, JUSTICE is for sale in Peru," *id.* ¶ 7, the condemnation of the Peruvian court system that plaintiffs highlight in their brief.

I will further consider Arteta Infantas's affidavit *infra*, but it is useful to note three points at this time. First, Arteta Infantas's experience was limited to labor matters; he had no responsibility for environmental claims such as those asserted by plaintiffs. Second, Arteta Infantas left Southern Peru in 1992, when Fujimori was president of Peru. As we shall see, plaintiffs' Peruvian expert ascribes the most recent corruption of the Peruvian judicial system to that politician and his associates. But Fujimori left office in November 2000, eight years after Arteta Infantas left Southern Peru, and it is common ground that reforms have since been achieved, although their extent may be the subject of debate. Third, Flury, the company's general counsel, states in a supplemental affidavit, not subsequently contradicted by plaintiffs, that Arteta Infantas "was dismissed from the Company in 1992 for nonperformance and misfeasance. Since his dismissal Mr. Arteta Infantas has become an adversary of the Company. He has initiated at least four lawsuits against Southern Peru Copper in the courts of Peru." Flury Aff. verified June 13, 2001 ("Flury Aff. II"), ¶ 5. These circumstances would suggest that (1) Arteta Infantas is biased against the company and (2) he has regained some measure of faith in the integrity of the courts of Peru, now that Fujimori is gone.

Plaintiffs also seek support for their unavailability-by-judicial corruption assertion in two affidavits of Abraham Siles Vallejos, a Peruvian lawyer and law school professor, verified May 7, 2001 ("S.V. Aff.

I"), and July 18, 2001 ("S.V. Aff. II"). In his first affidavit Siles Vallejos states that "[p]resently, Peru is immersed in a process of moving toward the restoration of the State of Law. The dismantling of a sophisticated machinery for the control of the institutions of the State, erected by ex-President Fujimori and his collaborators during eight years in power under an openly or disguised dictatorial scheme (1992–2000), has begun." S.V. Aff. I ¶ 7. Siles Vallejos identifies Fujimori's "intelligence adviser," Vladimiro Montesinos, as a principal collaborator, and states that the publication on September 14, 2000 of a video showing Montesinos bribing an opposition Congressman led quickly to Fujimori's resignation and flight to Japan. *Id.* ¶ 13. A "Transition Government" was inaugurated in November 2000, and a presidential election was scheduled for July 28, 2001. *Id.* ¶¶ 11, 13. The Transition Government promptly began to remedy corruption in the judicial branch and elsewhere; thus Siles Vallejos was able to say in May 2001 that "the members of the Constitutional Tribunal, who were arbitrarily removed from office, have been reinstated, and the litigious authority of the Inter–American Court of Human Rights has been returned; powers have been returned to the National Judiciary Council and the Executive Commissions of the Judicial Branch and the Public Ministry have been deactivated, while some directive authorities of the National Elections Jury, the National Electoral Procedures Office, and the Public Ministry and the Supreme Court of Justice have been renewed." *Id.* ¶ 15. Siles Vallejos makes the point that "such measures in themselves are not sufficient. They are barely a first—although, without doubt, an important—step, but which require successive complementary actions in the difficult path of rebuilding the country's institutions." *Id.* ¶ 16. Silas Vallejos then describes at considerable

length the structure of the Peruvian judicial branch and the manners in which the Fujimori regime corrupted it, and he collects a number of publications and comments deploring that corruption, which focus principally upon conditions prior to Fujimori's departure. Siles Vallejos concludes his first affidavit by stating that "the country has still not attained the full restoration of the State of Law which is appropriate to a consolidated democracy, provided with a Judicial Branch which is honest, competent, effective and trustworthy for the citizenry. In that regard, beyond mere formal acknowledgment in the legislation, the actions and means today available before the national jurisdiction, are still seriously weighed down by the evils of provisional office, corruption and inefficiency of the system ..." *Id.* ¶¶ 76, 77.

Siles Vallejos's first affidavit stopped short of giving an opinion that the plaintiffs at bar could not get a fair hearing in the Peruvian courts. Avendaño, Southern Peru's principal expert witness on the present condition of the Peruvian courts, submitted a supplemental affidavit commenting, *inter alia*, on Siles Vallejos's views. Avendaño Aff. verified June 15, 2001 ("Avendaño Aff. II"). Avendaño expresses general agreement with Siles Vallejo's "views on the problems surrounding the Judiciary" during the Fujimori administration, *id.* ¶ 23, but disagrees with Siles Vallejo's opinion that "changes that have taken place as a result of the fall of the Fujimori regime are mere gestures which in fact bring no solution to the problems of the Judiciary in Peru," *id.* ¶ 24. Avendaño asserts that Siles Vallejo's analysis "ignores certain fundamental events that have already brought important changes to the Peruvian Judiciary," *id.* ¶ 25, and goes on to describe legislative changes "in the functions and membership of the National Council for the Magistracy," *id.* ¶ 29, as well as remedial actions taken by that

Council and a Transitional Council for the Judicial Branch, which has now given way to "a permanent Executive Council for the Judicial Branch, which is composed entirely of regularly appointed judges ratified by the National Council for the Magistracy [and which] is consequently responsible for the internal governance of the Judiciary," *id.* Additionally, the Constitutional Tribunal, dismissed by Fujimori, has been restored with a full complement of judges, competent to annul unconstitutional laws and given ultimate appellate jurisdiction in actions "brought in the courts to enforce basic constitutional rights." *Id.* ¶ 30. These developments prompt Avendaño to opine that Peru's "judicial panorama is radically different from the one that existed before November 2000," at which time Peru underwent "a radical change ... not only in its political direction but in the structure of its legal and judicial institutions," *id.* ¶ 31; that the recently elected President Alejandro Toledo "has confirmed his intention, and that of his parliamentary supporters, to respect fully the autonomy of the Judicial Branch and to promote the ways and means to ensure the independence, efficiency, and improvement of the Judicial Branch," *id.* ¶ 32; and that "although not all the problems of the Judiciary in Peru have been solved, the situation is radically different and undoubtedly better than the one prevailing just a few months ago," so that "a good number of the judges currently in office, especially at the level of regularly appointed members of the Supreme Court, are independent, honest, and competent," *id.* ¶ 33.

Avendaño's supplemental affidavit prompted Siles Vallejo's second affidavit, a 24–page document that criticizes the pace of judicial reform in Peru, quotes or paraphrases the views of a number of commentators, and calls attention to public statements and articles by Avendaño about the need for continued judicial reform that

Siles Vallejos views as contrary to the assertions in Avendaño's supplemental affidavit. Siles Vallejos argues that while "Peru is immersed in a process of moving toward the restoration of the State of Law" and changes "have occurred and continue to occur even today [July 12, 2001]," those changes, "being necessary and important, are not sufficient to fulfill the minimum standards of an independent, impartial and efficient judiciary, which would adequately guarantee the protection of the rights of persons." S.V. Aff. II ¶ 7. Siles Vallejos concludes that "although some encouraging changes have occurred in the Peruvian judiciary since the installation of the Transition Government, ... such changes are still insufficient and the result uncertain," *id.* ¶ 52, and opines that "at present Peru does not have an independent, impartial and efficient Judicial Branch which complies with the minimum standards provided in the Constitution and in international instruments on the subject, and that therefore the Peruvian judiciary does not constitute an adequate forum for the issuance of a fair verdict in a cause for personal injuries deriving from environmental pollution caused by a multinational mining company," *id.* at ¶ 53. Thus Siles Vallejo for the first time specifically addresses whether the Peruvian courts would furnish plaintiffs an "adequate forum," that principle of American *forum non conveniens* jurisprudence which Siles Vallejos now appears to have discovered.

Siles Vallejos's second affidavit led to a second supplemental affidavit from Avendaño. Avendaño Aff. verified Aug. 13, 2001 ("Avendaño Aff. III"). Avendaño stresses the importance of distinguishing "between, on one hand, questions about the ideal structure and optimal performance of the court system—issues about which knowledgeable observers may con-

stantly debate—and, on the other hand, whether corruption or external interference prevents the judicial system from providing an adequate forum for the administration of justice." *Id.* ¶ 10. In Avendaño's view, Siles Vallejo's second affidavit "confuses these two separate sets of questions." *Id.* Avendaño makes the perfectly sensible point, illustrated by this clash of affidavits, that "[t]he degree to which any judicial system approaches perfection, and ways in which any judicial system may be brought closer to perfection, are issues that knowledgeable observers will never exhaust, and on which there is never consensus." *Id.* ¶ 11.[27] Avendaño agrees with Siles Vallejo "that the judicial system in Peru has weaknesses and that there exist ways in which improvement of that system can and should occur," but he argues that "[t]his does not mean, however, that the judicial system is now incapable of providing an acceptable forum for the resolution of controversies." *Id.* ¶ 12. Avendaño reiterates his belief in that capability: "The indisputable recent advances in the judicial system, since the removal of the Fujimori regime, although not sufficient to make the judicial system beyond all need for improvement, nonetheless constitute significant progress that allows the conclusion that the judicial system is now capable of resolving controversies through a just process." *Id.* ¶ 15. Avendaño describes further steps taken in July 2001 to achieve judicial reform, *id.* ¶¶ 20, 21, and notes that "since Mr. Siles Vallejo executed his second affidavit on July 12, 2001, President Toledo and the new Congress have taken office," and through a number of public statements "have reaffirmed that the executive and legislative branches cannot interfere with the administration of justice." *Id.* ¶ 22. "Moreover," Avendaño

---

**27.** Indeed, I think it plain that at least a dozen United States citizens, perhaps even more, do not regard the federal judicial system as perfect.

goes on in this affidavit executed on August 13, 2001, "it is obvious that now, as never before in Peru, public opinion is centered on the topic of the judicial system, which also provides an assurance for the advancement of the rule of law." *Id.* Nor does Avendaño acknowledge an inconsistency between his public utterances on judicial reform and the affidavits he has given in this case: "I have continued to advocate ways in which the Peruvian judicial system can be made more perfect—including more efficient and more insulated from the potential for political influence. But there is no contradiction, as Mr. Siles Vallejos suggests, between my public statements in Peru advocating such improvements, and the observations in my affidavits that, in light of the removal of the Fujimori administration, the judicial system of Peru is capable of providing fair adjudication of disputes in a manner that satisfies acceptable standards for impartiality, independence, and efficiency." *Id.*

Now what is a United States District Judge to make of all this?

Several facts are apparent. Both the plaintiffs and the defendant at bar agree that during the Fujimori regime, the Peruvian judicial system was thoroughly corrupted. They also agree that after Fujimori left office in November 2000, the judicial system has been improved. They also agree that there is room for more improvement. They also presumably agree that so long as the ranks of a judicial system are filled by men and women, and not by angels, that system will never satisfy the Gospel injunction: "Be ye therefore perfect." [28] Their disagreement, then, comes down to this: MacLean and Avendaño believe the reforms have progressed to the point where the Peruvian courts furnish an adequate forum for plaintiffs' claims, and Siles Vallejo does not.

I must decide between the opinions of these qualified legal experts, viewed in the light of applicable Second Circuit authority. Initially, however, I note the complete lack of probative value of the Arteta Infantas affidavit, notwithstanding the prominence plaintiffs give in their briefs to Arteta Infantas's lay declaration that "justice is for sale in Peru," a catchy title Arteta Infantas may or may not have come up with himself. I give no weight to Arteta Infantas's affidavit because he clearly is a disgruntled and hostile former employee of Southern Peru with no personal knowledge of environmental cases involving the company; and, in any event, Arteta Infantas, whom Southern Peru fired in 1992, is not in a position and makes no effort to discuss the reformation of the Peruvian judiciary achieved after Fujimori was deposed in 2000. That conditions have since improved would seem to be indicated by Arteta Infantas's more recent expenditure of his time and presumably some of his resources in suing Southern Peru in the Peruvian courts. In his affidavit Arteta Infantas makes no effort to assess the present state of the Peruvian judiciary, the question pertinent to this motion; nor would he be qualified to do so.

Siles Vallejo is qualified to opine on that question, and his opinion is negative. However, in order for me to hold that Peruvian courts of the present remain so crippled by the corruption of the past that they cannot adjudicate fairly claims by Peruvian citizens, I must reject the contrary opinions of MacLean, a law professor and former law school dean, Peruvian Supreme Court justice, and ambassador, and of Avendaño, a practicing lawyer and former law school dean and member of the Peruvian Congress. If I were writing on a blank slate, I would accept the opinions of MacLean and Avendaño and reject that of Siles Vallejos.

---

**28.** Matthew 5:48.

But I do not write on a blank slate; Second Circuit jurisprudence furnishes both a caution and guidance. Plaintiffs ask this American court to declare that the courts of Peru remain so corrupt that they cannot dispense justice, despite the well-documented reform measures taken since President Fujimori was removed 20 months ago, and the publicly expressed resolve of his successor. However, the Second Circuit has in a number of *forum non conveniens* decisions cautioned district courts against blanket condemnation of the adequacy of another nation's courts. See *PT United Can Co.*, 138 F.3d at 73 (in determining adequacy of alternative forum in *forum non conveniens* analysis, "considerations of comity preclude a court from adversely judging the quality of a foreign justice system absent a showing of inadequate procedural safeguards, so such a finding is rare") (citation omitted); *Blanco v. Banco Industrial de Venezuela, S.A.*, 997 F.2d 974, 982 (2d Cir.1993) ("[W]e have repeatedly emphasized that it is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation.") (citations and internal quotation marks omitted). In *Sussman v. Bank of Israel*, 801 F.Supp. 1068 (S.D.N.Y.1992), *aff'd*, 990 F.2d 71 (2d Cir.1993), where the

plaintiff resisted *forum non conveniens* dismissal in favor of Israel on the ground (supported by an Israeli law professor's affidavit) that Israeli courts would indulge a "negative predisposition" in favor the defendant Bank of Israel, a government agency, I had occasion to say that "plaintiff's preference for an American court cannot be indulged on the basis of an American judge's speculation that his Israeli colleagues would violate their oaths of office. . . . [I]t will be a black day for comity among sovereign nations when a court of one country, because of a perceived 'negative predisposition,' declares the incompetence or worse of another nation's judicial system." *Id.* at 1078.

Accordingly an American court will refrain from condemning as inadequate a legal remedy afforded by the courts of another nation unless it appears that such remedy is "so clearly inadequate that it is no remedy at all." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). That cannot be said of the courts of Peru at the present time. I conclude that the Peruvian courts furnish an available and adequate forum for the adjudication of plaintiffs' claims against Southern Peru and the awarding of appropriate damages if those claims succeed.[29] It would be entirely inappropriate

29. Mindful of the Second Circuit's admonition in *Jota*, 157 F.3d at 159, that a district court may not rest a *forum non conveniens* dismissal "entirely on adoption of another district court's weighing of the relevant factors," I have weighed independently the threshold factor of the suggested alternative forum's adequacy and resolve that issue in Southern Peru's favor for the reasons stated in text. However, it is not inappropriate to note that a number of other American courts have held that the Peruvian courts furnish an adequate alternative forum. *Cf. Blanco*, 997 F.2d at 981–982 ("We note in this regard a number of cases that have explicitly or implicitly concluded that Venezuela is an adequate alternative forum for purposes of *forum non*

*conveniens* rulings."); *see Torres*, 965 F.Supp. 899, *aff'd*, 113 F.3d 540 (Peruvian courts found adequate to adjudicate environmental claims by other residents of Ilo arising out of same facts alleged by plaintiffs at bar); *Gonzalez v. Naviera Neptuno A.A.*, 832 F.2d 876 (5th Cir.1987) (district court abused discretion in refusing to grant *forum non conveniens* dismissal in favor of Peru of wrongful death action brought by Peruvian survivors of Peruvian seaman against Peruvian shipping company under Jones Act and general maritime law); *Diaz v. Humboldt*, 722 F.2d 1216 (5th Cir.1984), *overruled on other grounds, In re Air Crash Disaster Near New Orleans*, 821 F.2d 1147 (5th Cir.1987) (district court's *forum non conveniens* dismissal should have been

for this Court to hold, on the basis of this record, that these Peruvian citizens cannot obtain justice in the courts of their own country, and I decline to do so.

I do not overlook a second, more narrowly focused argument plaintiffs make on this point. Plaintiffs assert that "SPCC is exempt from Peru's laws governing emissions," an assertion seemingly implying that plaintiffs could not bring actions against Southern Peru in the Peruvian courts for damages caused by emissions from the Ilo foundry. Opp. Brief at 29.

Plaintiffs base this argument on an affidavit of Walter Valdez M., verified May 7, 2001. Valdez is a Peruvian lawyer specializing in environmental matters. *Id.* ¶ 1. After another reference to the past villainy of Fujimori and Montesinos, *id.* ¶ 7, Valdez says that in March 1998 the Peruvian Ministry of Energy and Mines and Southern Peru entered into a multi-year "Contract for Environmental Administrative Stability" pursuant to which Southern Peru "is exempted from compliance with the existing Peruvian laws, standards and regulations which govern emissions into the air from the Ilo Copper Foundry, as well as the Refinery," *id.* ¶ 11. Valdez asserts that "[e]ven though the Peruvian Government should reduce the maximum permissible emission levels, Southern Peru Copper is not obligated to comply with the said emission levels," and during the life of the Contract, "litigants who bring claims for personal injury or damages may not demand that Southern Peru Copper comply with the maximum permissible limits established in the national legislation because the aforesaid company is protected by the aforesaid Contract," an argument

that Valdez says Southern Peru has used "to win favorable pronouncements from the Peruvian authorities in cases of claims by the affected populations." *Id.*

I do not read Valdez's description of this Contract as rendering the Peruvian courts unavailable to plaintiffs or the judicial remedies inadequate to address plaintiffs' claims. I am strengthened in that reading by Avendaño's supplemental affidavit, which explains that the purpose of such Contracts "is to provide stability, for a limited term, to the maximum permissible contamination levels set forth by the norms in effect at the time the contract is made." Avendaño Aff. II ¶ 19. Avendaño points out that those levels "have not been modified since 1996," the year Southern Peru contracted with the Peruvian Ministry, and "[t]herefore, Southern Peru's present legal position *vis a vis* maximum permissible contamination levels is exactly the same in which it would be if the Contract had never been executed." *Id.* ¶ 20. Avendaño also points out that under the Peruvian Environmental Code "there is a *maximum* permissible level of concentration of pollutants, below which the competent authorities do not foresee any risk to health and ecosystems. This maximum permissible level is legally binding and set by the Ministry of Energy and Mines." *Id.* ¶ 21.

The conclusions I reach from these affidavits are that if subsequent to 1996 the Ministry reduced the maximum permissible level of pollutants, thereby making it conceptually easier for an environmental plaintiff to prove a violation, Southern Peru would be protected from the consequences of that reduction by the stability

made conditional upon defendant's stipulation to suit under Peruvian jurisdiction); *Vargas v. M/V MINI LAMA,* 709 F.Supp. 117 (E.D.La.1989) (in Peruvian seaman's action to recover for injury aboard Greek flag vessel in New Orleans, alternative forums of Greece

and Peru both found to be available and adequate). Plaintiffs at bar do not cite any American case holding that the Peruvian courts do not furnish an adequate remedy for a particular claim, and the Court's research has discovered none.

derived from the Contract if still in effect. But the question does not arise because the Ministry has not changed the permissible levels since 1996; they are today what they were then. There is nothing in any of this to demonstrate that the courts of Peru do not constitute an available and adequate alternative forum for plaintiffs' claims. I hold that they do so.

Having answered the threshold question in defendant's favor, I turn to the private and public interest factors set forth in *Gulf Oil Co. v. Gilbert* and its progeny.

### 4. *Private Interest Factors*

In Part II.A., *supra*, I referred to the two sets of factors, private interest and public interest, which courts must consider in the next stage of *forum non conveniens* analysis. I turn now to the private interest factors involved in this case.

As previously noted, the private interests include "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make a trial of a case easy, expeditious and inexpensive." *Gilbert*, 330 U.S. at 508, 67 S.Ct. 839. The Second Circuit characterized these factors as relating to "the convenience of the parties," *Iragorri*, 274 F.3d at 73, and went on to say: "In considering these factors, the court is necessarily engaged in a comparison between the hardships defendant would suffer through the retention of jurisdiction and the hardships the plaintiff would suffer as the result of

dismissal and the obligation to bring suit in another country." *Id.* at 74.

■ No extended analysis is required to demonstrate that all the "practical problems" specifically identified in *Gilbert* militate in favor of dismissal. This action is brought by residents of Peru to recover for damages allegedly caused in Peru by the operation of a metals foundry and refinery in Peru. The principal fact witnesses, including plaintiffs and the defendant's operating personnel, are in Peru; many of the witnesses, again including plaintiffs, speak only Spanish, Flury Aff. I ¶ 18; [30] most if not all of the pertinent documents are in Peru, and all documents in the Peruvian government's files "and virtually all of the operating documents in the Company's files would be in Spanish," *id.*; and the premises, if they are to be viewed by the fact-finder (which seems appropriate in this case) are in Peru. If this case were presented to a jury in this Court, the translation requirements alone, of testimony and documents, would double the length of the trial.[31]

But plaintiffs make two arguments relating to the *Gilbert* private interest factors. First, they say that their choice of forum should control. Second, they say that they cannot afford counsel, and (unlike the United States) contingent fee arrangements are not available in Peru. Neither of these arguments withstands analysis.

First, plaintiffs are foreign residents. I noted in Part II.A. the Second Circuit rule that "a foreign resident's choice of a U.S. forum should receive less consideration." *Iragorri*, 274 F.3d at 71; *see also Capital Currency Exch., N.V. v. Nat'l Westminster*

---

**30.** Many residents of Ilo, the area involved in this case, "are migrants from the Andes Mountains who speak better Aymara or Quechea than Spanish." Flury Aff. I. ¶ 18. The more important point is that these individuals do not speak English.

**31.** That is also a factor that may be considered in evaluating the public interests, discussed in Part II.B.4., *infra*.

*Bank PLC,* 155 F.3d 603, 612 (2d Cir.1998) ("Because the real parties in interest are foreign corporations, there is not a strong presumption in favor of the plaintiff's choice of forum.") (citation omitted). Moreover, the plaintiffs' choice of this American forum is transparently "motivated by forum-shopping reasons," *Iragorri,* 274 F.3d at 72, "and consequently, the easier it becomes for the defendant to succeed on a *forum non conveniens* motion by showing that convenience would be better served by litigating in another country's courts," *id.*

Second, while I accept that these plaintiffs cannot afford to retain counsel on a straight fee basis, the record indicates that contingent fee arrangements are available under Peruvian law. Plaintiffs base their assertion to the contrary on the affidavit of Marga Rosario Juarez Velasquez, a Peruvian lawyer who has practiced "nearly 7 years continually as a lawyer in Ilo" and was the chairperson of the Ilo Lawyers Association in 2000–2001. Aff. verified May 7, 2001, ¶ 2. Juarez Velasquez states that "no lawyer renders services on a contingent fee basis," owing to the deteriorated Peruvian economy. *Id.* at p. 5. However, MacLean states that "[i]n Peru it is possible to hire lawyers on a contingency fee basis." MacLean Aff. ¶ 11. His assertion is corroborated by the Code of Ethics of the Peruvian Bar Association, to which counsel for Southern Peru referred as "published online." *See* Main Brief at 3, citing http://www.onlineethics.org/spanish/abo-peru.html. Counsel did not think to supply the Spanish text or a translation. The Court downloaded the text and obtained the services of a Court-certified interpreter. Article 29 recites that "contingent fee agreements are not forbidden," except in certain cases not pertinent here, and goes on to specify certain rules, including the provision that "[i]f the case did not have a favorable disposition, the attorney shall not collect fees, but he may request reimbursement for expenses directly incurred for his services," Article 29.4, a provision comparable to contingent fee rules in the United States.

It seems unlikely that the Peruvian bar would go to the trouble of regulating contingent fee arrangements in its Code of Ethics if Peruvian lawyers never enter into them. The reading I give to the Juarez Velasquez affidavit is that no lawyers in the relatively small community of Ilo, to which her practice has been confined, would take these plaintiffs' case on a contingent basis. That affidavit does not establish that no lawyer in Peru, from larger legal communities, would do so, and there is no indication that plaintiffs have explored that possibility.

Even if, contrary to my conclusion, plaintiffs have established a financial inability to obtain legal representation by any means in Peru, that does not require this Court to retain jurisdiction. In *Murray v. British Broadcasting Corp.,* 81 F.3d 287 (2d Cir.1996), the leading Second Circuit case on the subject, the Court of Appeals identified "a plaintiff's financial hardships resulting from the absence of contingent fee arrangements to be only one factor to be weighed in determining the balance of convenience *after* the court determines that an alternative forum is available" and went on to say: "Balancing the plaintiff's financial burdens as one of several relevant factors serves the repeatedly emphasized need to retain flexibility in the application of the *forum non conveniens* doctrine. Indeed, to do otherwise would render the financial burden on a plaintiff the determinative factor, notwithstanding overwhelming public and private interests weighing in favor of dismissal of the American action." 81 F.3d at 292 (citations, internal quotation marks, and ellipses omitted). For the reasons stated and to be stated in this opinion,

such overwhelming public and private interests militate in favor of dismissal in this case, whatever plaintiffs' financial abilities and the availability of contingent fee representation in Peru may be.

### 5. *Public Interests*

■ The public interests identified by *Gilbert* include court calendar congestion; a recognition that "[j]ury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation"; the view that in cases "which touch the affairs of many persons, there is reason for holding the trial in their view"; and the "local interest in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself." 330 U.S. at 508–09, 67 S.Ct. 839.

Again, it requires no extended analysis to show that, like the private interest factors, these public interest factors strongly counsel dismissing this action in favor of Peru. Court congestion in the Southern District may have abated somewhat from the near-crisis conditions of yesteryear, but the Court's judges have many challenging cases to administer, and Southern District jurors come from a community which has no relation to the litigation. While plaintiffs cast their claims in terms of international law, it is likely that the Peruvian law, regulations, and decrees relating to mining and environmental protection would have to be considered by the trial court and jury. And as previously noted, the testimony and documents would pose formidable translation requirements.

Plaintiffs argue that the ATCA constitutes a congressional statement of public policy mandating this Court's retention of jurisdiction. But I have concluded in Part II.B. that, under the Second Circuit rule, the ATCA does not preclude application of the *forum non conveniens* doctrine. So the issue comes down to the effect, if any, that the ATCA should have in *forum non conveniens* analysis, a question the Second Circuit left open in *Jota*, 157 F.3d at 159 n. 6. Arguably, the circumstance created by ATCA is analogous to a treaty granting foreign citizens access to American courts; and, in such a situation, the Second Circuit has ruled that "when a treaty with a foreign nation accords its nationals access to our courts equivalent to that provided American citizens, identical *forum non conveniens* standards must be applied to such nationals as to American citizens." *Blanco v. Banco Industrial de Venezuela, S.A.,* 997 F.2d 974, 981 (2d Cir.1993). The Venezuelan plaintiff in *Blanco* sued pursuant to a treaty between the United States and Venezuela. Accordingly, the Court of Appeals said, "no discount may be imposed upon the plaintiff's initial choice of a New York forum in this case solely because Pyrofecin [the plaintiff] is a foreign corporation," although the Court immediately added that under *Gilbert* "a plaintiff's choice of forum may be overturned when the balance of relevant considerations is strongly in favor of the defendant," *id.* (citation and internal quotation marks omitted), and dismissed the action in favor of the Venezuelan courts. *See also Farmanfarmaian v. Gulf Oil Corp.,* 588 F.2d 880 (2d Cir.1978) (dismissing suit by Iranian national on basis of *forum non conveniens* despite treaty that mandated court access equivalent to that of American citizen).

If one analogizes these treaty cases to one brought under the court-access provision of the ATCA, then plaintiffs at bar are not subject to the "discount" that would otherwise be imposed upon their choice of forum because they are foreign residents. I think that is the maximum effect that the ATCA can have in applying the *forum non*

*conveniens* doctrine to this case; but it is insufficient to defeat defendant's motion, since the private and public interest factors in the case at bar overwhelmingly favor dismissal. *Cf. Capital Currency Exch.*, 155 F.3d at 612 ("Because the real parties in interest are foreign corporations, there is not a strong presumption in favor of plaintiff's choice of forum. Thus, Judge Stanton properly concluded that England was the correct forum. We note, however, that even if the real parties in interest were American, we would find that Judge Stanton did not abuse his discretion in dismissing this suit, because the private interest factors weigh so substantially in favor of England.").[32]

If I had not decided, as I did in Part I of this Opinion, that the Court lacked subject matter jurisdiction of the case at bar, I would for the reasons stated in Part II dismiss the action on the grounds of *forum non conveniens*. I would condition that dismissal upon the defendant filing in this Court a stipulation with respect to the claims plaintiffs plead in their complaint agreeing to (1) defend those claims on the merits in any action plaintiffs may bring in a Peruvian court and (2) waive any statute or period of limitations that would otherwise apply under Peruvian law to any action brought by plaintiffs in a Peruvian court within two years after the date of this Court's order of dismissal or the resolution of any and all appeals from that order, whichever occurs later.

The Clerk of the Court is directed to dismiss the complaint for lack of subject matter jurisdiction. Because the dismissal is on jurisdictional grounds, it will be without prejudice.

It is SO ORDERED.

---

**32.** I have previously noted that in *Wiwa*, 226 F.3d 88, where plaintiffs alleged they and their next of kin "were imprisoned, tortured and killed by the Nigerian government in violation of the law of nations at the instigation of defendants," *id.* at 92, the Second Circuit disclaimed any suggestion that "the TVPA has nullified, or even significantly diminished, the doctrine of *forum non conveniens*," before concluding: "The TVPA in our view expresses a policy favoring our courts' exercise of the jurisdiction conferred by the ATCA in cases of torture unless the defendant has fully met the burden of showing that the *Gilbert* factors tilt strongly in favor of a trial in the foreign forum." *Id.* at 106 (citation and internal quotation marks omitted). The case at bar does not implicate the TVPA or its discerned policy, and I have applied to the case a traditional *Gilbert* factors analysis which requires dismissal even if the ATCA, standing alone, should be viewed as immunizing these foreign resident plaintiffs from a choice of forum "discount."